STATE of Utah, Plaintiff and Respondent,

v.

Michael S. CHAMBERS, Defendant and Appellant.

No. 19532.

Supreme Court of Utah.

Oct. 25, 1985.

Frank M. Wells, Ogden, for defendant and appellant.

David L. Wilkinson, J. Stephen Mikita, Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

This is a criminal case arising out of false insurance applications made by the defendant. The defendant entered a guilty plea to one count of making a false insurance claim. U.C.A., 1953, § 76–6–521 (1978). After entry of the plea, a restitution hearing was held and an order of restitution entered in connection with sentencing. The defendant challenges that order and seeks either a resentencing by the trial court or a new hearing below on the subject of restitution. He claims that it was improper for a judge other than the one who took his plea to conduct the restitution hearing and enter the restitution order, and that the restitution amount ordered was not supported by the record.

■ We dispose summarily of the defendant's first claim. The record shows that Judge Calvin Gould received the defendant's plea and ultimately imposed sen-

tence, including an order for the payment of the restitution amount fixed by Judge John Wahlquist after extensive hearing. Since the defendant may challenge the propriety of that restitution amount on appeal, as he does here, there is nothing improper about the procedure followed below. We are essentially reviewing the order entered by Judge Wahlquist, and the fact that his order was incorporated in a sentence imposed by another judge does not adversely affect the defendant in any way.

The remainder of the defendant's claims are more complicated. The defendant worked for six years as an insurance agent and for one year as manager for the Ogden office of American National Insurance Company ("American National"). In 1975, he wrote a valid IRA policy for the employees of Glen's Chevrolet of Pocatello, Idaho, a dealership run by his mother and stepfather. Beginning in 1976, the defendant wrote or caused to be written 113 "fencepost" life insurance policies on the lives of persons employed by Glen's Chevrolet. These policies were written without the knowledge or consent of the persons named in the applications, which contained forged signatures and false addresses. The defendant paid the premiums on the bogus insurance policies with money he obtained by overbilling Glen's Chevrolet for the IRA policy and with funds properly billed to and paid by Glen's Chevrolet but not forwarded to American National. The defendant also claimed that he used personal funds to pay some of those premium amounts, but was unable to establish the amount of such payments.

At the restitution hearing before Judge Wahlquist to determine how much money had been lost by American National as a result of the defendant's actions, the following evidence was produced: from 1971–1981, the defendant personally received $119,463.30 in payments from Glen's Chevrolet for the IRA account; the proper billing for the IRA account during that period was only $93,422.64; the defendant intentionally overbilled the dealership for the remaining $26,040.66; of the $119,463.30 paid by Glen's Chevrolet, the defendant

sent only $64,515.52 to American National for the IRA account.

An auditor for American National compiled a five-volume audit of the defendant's dealings with the company. The auditor testified, and the defendant agreed, that American National received a total amount of $28,754.30 in premium payments for the 113 fencepost insurance policies. The auditor testified that American National incurred expenses in the establishment and maintenance of these policies and that American National paid the defendant commissions on the premiums received. The defendant also won an expense-paid trip to Spain from American National based on his sales record, which the auditor said was the result of the fencepost policies. The defendant testified that the fenceposts never exceeded ten to fifteen percent of his total business and that they had no effect on his winning the trip. The auditor failed to document the amount of overhead expenses attributed to the fencepost policies, the amount paid by way of commissions, and the cost of the trip to Spain. The sales commissions paid to the defendant were apparently fifty-five percent of the first year's premiums, and a smaller percentage of premiums paid thereafter on each policy. Notwithstanding that testimony, and a finding to the same effect, the trial judge estimated that the defendant had received in excess of $15,000 in commissions on the $28,754.30 in premium payments on the fencepost policies. Since the total of $28,754.30 was received over a period of several years, the estimate of the court regarding premiums appears to be erroneous and not supported by the evidence.

After the defendant's illegal acts were discovered, American National reimbursed Glen's Chevrolet for the $26,040.66 in excess billings on the IRA account. American National then credited $31,123.85 to the IRA account to restore, with interest, the amounts paid by Glen's Chevrolet but not forwarded by the defendant. Thus American National spent $57,164.51 to repair deficiencies created by the defendant's

wrongful actions. This amount was not disputed at the restitution hearing.

American National also claimed that it was entitled to reimbursement for the cost of the audit conducted by its investigator. The auditor was an employee of American National, not an outside auditor, and there was no evidence to indicate the actual cost to the company of the audit.

■ The defendant testified that he sent substantial sums of his own money, plus all of the money he wrongfully received from Glen's Chevrolet, to American National. The defendant was able to document payments made by him to the company by presenting cancelled checks on his personal accounts. The transcript of the hearing shows, however, that he was unable to prove with any degree of certainty how much of the money so transferred came from his personal funds as opposed to those funds which he wrongfully retained from the Glen's Chevrolet payments. Further, the defendant was unable to demonstrate what portion of those personal payments actually benefitted American National, since some payments were apparently submitted to cover agent shortages belonging to the defendant and his agents, some of which may have related to the fencepost policies and some of which were unconnected with those accounts. The defendant has not made a part of the record any of the underlying documentation submitted to the trial court, and we are therefore forced to rely on the information in the transcript and on the findings of the trial court where they are consistent with what is in the transcript. The defendant claims in his brief that the company received $73,625 from him in addition to the $64,515.52 paid into the IRA account. He further claims that $15,000 of that amount came from his personal funds. Our review of the transcript, however, shows that there was no proof at the hearing that those sums were received by the company in connection with either the IRA account or the 113 fencepost policies. The defendant argues that he should have credit for the total amount of money he can show he transferred to the company. He makes that claim even though the testimony indicates that some or all of the payments he documents are already accounted for by the $28,754.30 in premiums credited on the company's books or are attributable to totally separate problems such as agent shortages, and even though he has never explained in his testimony or in his brief why it would be proper to give him credit for paying other amounts he owed to the company with the funds he wrongfully withheld from the Glen's Chevrolet monies. Presumably he would have had to pay those monies to the company in any event, and the company did not receive any benefit to which it was not otherwise entitled. In the context of this failure to identify the purpose for which the defendant's numerous payments to the company were made, the trial judge's determination not to credit the defendant with any payments over and above the premium amounts is supportable. We will not substitute our judgment for that of the trial judge on the credibility of the testimony.

■ Notwithstanding the foregoing, we are unable to sustain the trial court's order on the basis of the record before us. That order specified that the defendant should pay a restitution amount of $50,000, but we are unable to ascertain how such a sum was arrived at. Based upon the foregoing information and the specific findings of fact made by the trial judge, our assessment of the actual loss suffered by American National and proved by the State at the restitution hearing is as follows:

Monies Disbursed by American National:

Refund owed Glen's Chevrolet
for overbilling .............. $26,040.66

Credit to Glen's Chevrolet IRA
account to bring current .... 31,123.85 [1]

---

**1.** The State argued that American National would actually have earned higher rates of return on these funds than it was obligated to pay to Glen's Chevrolet and that the company should recoup those lost earnings. No evidence was offered, however, to document the amount of such losses.

Monies Disbursed by American National:

| | | |
|---|---|---|
| Cost of audit ................. | ** | |
| Cost of Chambers' trip to Spain | ** | |
| Overhead expenses for establishing and maintaining 113 fencepost policies ............... | ** | |
| Total Disbursements .......... | $57,164.51 | |

**—amount not established at hearing

Money Received by American National:

| | |
|---|---|
| Premiums for 113 fencepost policies ....................... | $28,754.30 |

The difference between the totals of these two categories should represent the actual loss experienced by American National because of the defendant's actions in overbilling Glen's Chevrolet on the IRA account and in writing 113 bogus policies. The actual dollar difference proved at the restitution hearing is therefore the difference between $57,164.51 and $28,754.30, or $28,410.21. Added to that figure should be the amount of commissions paid to the defendant on the 113 policies. The trial judge apparently computed that at a simple fifty-five percent of the total premium payments, but, as we have indicated earlier, that figure is not accurate, since the percentage paid in commissions dropped after the first year. It does appear, however, that an accurate computation of that amount can be completed from the supporting documents on file before the trial court. We therefore vacate the order of the trial judge for restitution in the amount of $50,000 and remand this case for further review to determine, if possible, the actual amount of commissions paid for which the defendant should reimburse American National. That amount should be added to the $28,410.21 already proved and a final restitution order entered accordingly. Not having offered proof of any amounts associated with the other items (the trip to Spain, the company's overhead expenses, and the audit), the State may not properly ask the court to order defendant to reimburse American National for those expenditures. We note that we have considered the arguments raised by the defendant concerning laches and find them to be without merit.

The restitution order is vacated and this case remanded to the district court for further proceedings consistent with this opinion.

HALL, C.J., and STEWART, HOWE and ZIMMERMAN, J., concur.

